# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO.

| | |
|---|---|
| ALANDA RICHARDSON, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) **COMPLAINT**<br>) (Jury Trial Requested) |
| CITY OF HICKORY and the HICKORY PUBLIC HOUSING AUTHORITY BOARD ("HPHA") | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**COMES NOW**, the Plaintiff, by and through undersigned counsel, complaining of the Defendant, and alleges and says:

## NATURE OF THE CASE

This action is brought pursuant to 42 U.S.C. § 1981 and the common law of the State of North Carolina for Breach of Contract and other ancillary claims. The jurisdiction of this Court is invoked to redress the deprivation of rights guaranteed by federal and state law. These rights provide for damages for illegal discrimination in the making and enforcement of contracts due to race. Plaintiff Richardson seeks damages, including, but not limited to, lost pay, loss of past, present, and future benefits, compensatory damages, and pain and suffering as a result of the intentional and unlawful discrimination by Defendant as more fully described below.

1

## PARTIES AND JURISDICTION

1. The Plaintiff, Alanda Richardson, is an African-American female citizen and resident of Hickory, Catawba County, North Carolina.

2. Upon information and belief, the City of Hickory, North Carolina (hereinafter "Defendant" or "City") is a body politic and corporate capable of suing and being sued under the laws of the State of North Carolina.

3. Upon information and belief, the Hickory Public Housing Authority Board (hereinafter "HPHA" or "Board") was created by the City of Hickory with the City Mayor appointing the Board members.

4. This Court has original jurisdiction over the subject matter of the complaint pursuant to U.S.C. § 1331, as this matter arises under federal law and presents a federal question. This Court may also exercise pendant jurisdiction over claims grounded in state law.

5. This Court may exercise personal jurisdiction over Defendants, as the Western District of North Carolina is where the Plaintiff resides and where the facts giving rise to the allegations occurred.

6. Venue is proper pursuant to U.S.C. §1391 as the Western District of North Carolina is the District in which Plaintiff resides and where the acts giving rise to Plaintiff's claims occurred.

7. The City of Hickory is an employer who regularly employs more than fifteen (15) persons.

8. Upon information and belief, Defendant has purchased liability insurance and/or participates in a risk pool that covers the claims alleged herein and the same is sufficient to effectuate a waiver of its sovereign and/or governmental immunity.

## FACTUAL ALLEGATIONS

9. Paragraphs 1-8 are re-alleged and incorporated herein by reference.

10. Plaintiff Alanda Richardson was originally hired as the Executive Director/Chief Executive Officer ("CEO") of the HPHA on May 11, 1998, hereinafter ("Ms. Richardson" or "CEO")

11. Ms. Richardson's tenure as CEO spanned more than Twenty-Six (26) years, and numerous federal administrations, making her one of the most experienced leaders in public housing in the nation.

12. The Board of Commissioners of the HPHA is appointed by the City of Hickory Mayor.

13. On June 1, 2018, Ms. Richardson and the Board of Commissioners entered into a "Contract of Employment for Chief Executive Officer" for a five (5) year period, the same ending on July 1, 2023.

14. In 2023, the Board of Commissioners consisted of the following persons: Dr. Sidney Myles; Dr. Michael K Wimberly; Mr. Steve Hunt; Ms. Velecia Hackett; Mr. Grover Lineberger; Mr. David Roberts; Ms. Patricia Johnson; Ms. Sherri Long; and, Mr. Gary Fulbright.

15. On June 1, 2023, Ms. Richardson and the Board of Commissioners entered into a new five (5) year contract of employment, the same ending on July 1, 2028. (Ex. "A")

16. On or around October 3, 2024, Ms. Richardson and the Board of Commissioners entered into an "Addendum to Contract of Employment for Chief Executive Officer". (Ex. "B")

17. The Addendum was entered into to clarify the language, and avoid any doubt, as to the intention of the parties in the event the CEO is terminated other than for cause.

18. The Addendum specifically addressed the compensation due to the CEO in the event of termination of the HPHA due to a "Change in Control" and/or to "Termination of Employment Due to Abolition of HPHA".

19. Upon information and belief, Commissioners Myles, Wimberly, Hunt, Hackett, and Linebarger had all served on the Board numerous years as volunteers.

20. Upon information and belief, due to vacancies on the Board, Mayor Hank Guess appointed Gary Fulbright in October, 2021 and later appointed Sherry Griffin Long in February, 2024.

21. Upon information and belief, at the time of Griffin Long's appointment, Ms. Richardson noted her concern with the same as Griffin Long was also the Assistant / Deputy Executive Director of the Western Piedmont Council of Government ("WPCOG").

22. Upon information and belief, City of Hickory Alderwoman / City Council member Jill Patton serves on the board of WPCOG.

23. Shortly after the arrival of Griffin Long on the board, the HPHA started to receive complaints from the mayor and city council.

24. Ms. Richardson expressed concern over the appointment of Griffin Long as she was a Deputy/Assistant Director at WPCOG, the agency city council wanted to take over HPHA.

25. Upon information and belief, those complaints originated with the mayor and city council and were communicated to the Department of Housing and Urban Development ("HUD").

26. On May 17, 2024, HPHA received correspondence from a HUD representative about an email she had received from the City Manager referencing a complaint from tenant "AB".

27. On May 18, 2024, HPHA received reports which indicated that the Hickory Police Department ("HPD") had responded to AB's apartment 77 times from May 1, 2021 until May 18, 2024.

28. The following Monday, AB was evicted from the HPHA.

29. Upon information and belief, no reports of incidents with AB were ever reported to the HPHA.

30. On May 21, 2024, Ms. Richardson responded to a complaint from Mayor Guess regarding tenant "JR".

31. Ms. Richardson ran the open work order for JR's apartment and there were no open work orders.

32. On May 21, 2024, maintenance staff went to complete the work items JR had noted in her complaint despite there not being an open work order.

33. JR refused the maintenance staff entry into her apartment and further stated that she was unaware of any issues with her apartment. She further refused to sign an acknowledgement stating that she refused entry into the apartment.

34. On or around July 2-3, HUD conducted a site visit to the HPHA.

35. During the visit, HUD representatives instructed Ms. Richardson that HPHA needed to improve the relationship with the city.

36. The representatives further stated that things had become political and that they did not know how far the mayor would take it.

37. Prior to that time, Ms. Richardson and the HPHA were unaware of the alleged numerous complaints as there were no interactions with the city regarding the same.

38. Ms. Richardson and the HPHA were informed that the city had made 6,000 complaints to HUD about the HPHA over a five (5) year period.

39. Ms. Richardson and the HPHA were unaware of the complaints.

40. As a result, Ms. Richardson set up a meeting with the HPD in an attempt to get some answers regarding the complaints.

41. Mayor Guess contacted Ms. Richardson and informed her that several Board members were upset that they were not informed of the meeting and that it was best to cancel the same.

42. Ms. Richardson's response was that she was following the charge from HUD to improve the relationship with the city and if all board members were in attendance, it would have to be advertised as a public meeting.

43. Ms. Richardson elected to cancel the meeting.

44. Thereafter, Ms. Richardson contacted the Chief of Police to have officers attend the next board meeting to address the 6,000 calls that the HPHA knew nothing about.

45. In July, 2024, the HPHA held a meeting wherein the HPD was present.

46. Commissioner Hunt asked for clarification of the 6,000 police calls that HUD had received from the city regarding properties that HPHA served as management agent.

47. Phil Demas of the HPD stated that the HPD did not send calls to HUD.

48. Lt. Levey of the HPD stated that approximately 4,000 calls were law enforcement self-initiated, 911 calls, and/or warrants served calls.

49. Upon information and belief, all of the calls were not regarding criminal activity.

50. All drug related criminal activity is forwarded to the HPHA for disposition. The HPHA only receives those reports dealing with criminal activity and/or drug related activity.

51. Lt. Levey stated that he and Ms. Richardson speak regularly and that she would not have ever seen the 6,000 call report.

52. Lt. Levey advised the board that the HPD is trying to be more visible in the community, engaging citizen contact, and checking property, with the goal of deterring crime and addressing issues before they escalate to arrest.

53. Ms. Richardson and the board were advised that they would receive monthly police reports and they did for the months of July and August, 2024. However, they ceased after that.

54. Upon information and belief, the HPD also stopped attending HPHA board meetings at the urging of the mayor and/or city council.

55. Upon information and belief, the cessation of the flow of information from the HPD to the HPHA was due to a request from Mayor Guess.

56. Ms. Richardson, subsequent to a board retreat to discuss the issues, submitted to the City Manager the Annual Plan for the HPHA.

57. Upon information and belief, the Annual Plan is a HUD required document that outlines the mission, goals, and progress of the agency.

58. Mayor Guess indicated that he would not sign the document and Ms. Richardson advised HUD of that fact.

59. Ms. Griffin Long contacted the mayor during the retreat and he told her he had sent a certified letter to the HPHA and that he would not sign the document until given the information requested in the letter.

60. Ms. Richardson informed the board that she had not received such a letter and that if the authority did not submit the plan to HUD she did not know what the fallout would be.

61. Ms. Richardson asked the mayor to email the same to her which he did.

62. The letter was a formal records request for any and all documents associated with the RAD ("Rental Assistance Demonstration") transactions.

63. The formal records request was a two (2) page document with sixteen (16) action items.

64. The documents requested dated back to 2013 and were in storage. The request would require staff to review all information to extrapolate the specific requests contained in the letter.

65. It would be impossible to complete the task within a day or two. It took six (6) weeks to compile the documents, but the requests were fulfilled.

66. Shortly thereafter, the mayor sent a second and third request, including a copy of Ms. Richardson's 2018 and 2023 employment contracts.

67. Mayor Guess contacted Board Chairman Dr. Sidney Myles and advised of his displeasure with the contract if the HPHA was abolished.

68. Upon information and belief, the abolishment of the HPHA was discussed among the city council contemporaneous with, or as a result of, the mayor's requests.

69. The mayor or city council, at no time prior, had any discussions with Ms. Richardson regarding abolishing the agency. The information she and the board were privy of all came from articles published in the local newspaper.

70. One of the articles, dated January 8, 2025, allegedly referred to a report from HUD which stated that the HPHA was underutilizing their vouchers.

71. The city never asked or inquired of the HPHA to address the issue.

72. The article stated, "[i]t was revealed in October that the housing authority was only using 61% of its housing vouchers. The vouchers are given to qualifying families to help with rent. The state average for utilization of housing vouchers is 80% and the Western Piedmont Council of Government's utilization rate is 98%, according to the articles.

73. The "articles" referred to came from previous articles published in the Hickory Daily Record.

74. In May, 2024, the HPHA had 556 vouchers.

75. In May, 2024, the HPHA was informed via correspondence from HUD that the agency would have a $556,324.00 estimated shortfall in the Housing Choice Voucher ("HCV") program if it leased up the remaining 213 vouchers it had.

76. The financial shortfall meant that HUD could not financially cover the remaining vouchers.

77. There were more than two hundred (200) voucher holders looking for affordable housing in the HPHA's jurisdiction during that time.

78. Upon information and belief, the affordable housing inventory in Hickory was and is extremely low.

79. Upon information and belief, most, if not all, new construction in the City of Hickory is not for low-income to moderate-income individuals and families.

80. The difference between the 556 original vouchers and the 213 that could not be leased up due to the shortfall is 343.

81. Of the 343 vouchers the HPHA had to lease up, 298 were leased during that time.

82. Upon information and belief, the HPHA's voucher utilization rate, factoring in the inability to lease due to HUD shortfalls, is approximately 86.88%, and higher than the state average alluded to in the article.

83. Ms. Richardson and the HPHA reached out to the city, through their counsel, in an attempt to address and resolve any issues. The City Attorney informed their counsel that the city was not interested in discussing a resolution.

84. The board meeting on October 3, 2024 was duly noticed. The board members noted above voted unanimously to clarify the language in the contract for the "avoidance of doubt and to clarify the rights and obligations of Executive and HPHA".

85. On October 22, 2024, Mayor Guess sent letters addressed to the five (5) individual board members to counsel for the HPHA demanding that the board members who voted for the addendum attend a hearing to discuss their potential removal from the board. (Ex. C).

86. The letters were entitled "Notice to Commissioner(s) of the Hickory Public Housing Authority of Alleged Inefficiency, Neglect of Duty, and/or Misconduct in Office and Intent to Remove Pursuant to N.C.G.S. § 157.8".

87. Under the "Alleged Inefficiencies" portion of the letters, the Mayor states "… [t]he Authority has shown significant inefficiencies in administering vouchers under this Program [Housing Choice Voucher Program).

88. The letters further state that "[d]ata indicates that the Authority's utilization rate under the Program ranks 60 out of 65. The Authority has a 61.15% voucher utilization rate compared to Western Piedmont Council of Governments' ("WPCOG") rate of 97.83% and is leaving 216 vouchers unutilized."

89. Upon information and belief, WPCOG serves only rural communities in Alexander, Burke, Caldwell, and Catawba counties.

90. The Mayor's letters were only addressed to the five (5) board members that voted to clarify Ms. Richardson's contract.

91. All five (5) board members that received the Notice and Intent to remove letters were African-Americans. None of the Caucasian commissioners were sent such a letter.

92. On November 4, 2024, counsel for the HPHA responded to the Mayor's Notice and Intent to Remove, and Notice of Hearing letters.

93. HPHA counsel's six (6) page letter refuted each and every allegation made by the Mayor, in detail. (Ex. D).

94. Attached to HPHA's counsel's letter were the individual resignations of all five (5) African-American board members. (Ex. E).

95. Some board members individually expressing disdain at the accusations that were "fallacious and inaccurate" impugned their character, integrity, reputation, and good names.

96. Later in the month of November, 2024, Mayor Guess appointed two (2) new board members.

97. On December 5, 2024, Ms. Richardson inquired about the status of her employment to the HPHA Board of Commissioners. No response was received.

98. In January, 2025, the city council voted to abolish the HPHA and transfer the vouchers to the WPCOG effective July 1, 2025.

99. On or around January 10, 2025, the City of Hickory provided a press release to the Hickory Daily Record regarding credit card charges of Ms. Richardson.

100. The Record's article was entitled, "Housing Authority CEO's Spending Questioned by Hickory Officials, Payments Made to Temu, Beauty Boutique, Dillard's"

101. Prior to the press release, no one from the city inquired of Ms. Richardson about the efficacy of the credit card charges, or whether they were allowable, or whether she had the receipts, or what funds were used.

102. All of the credit card charges were housing authority-related and were used for housing agency-wide housing association expenses with non-federal funds.

103. On January 16, 2025, Ms. Richardson learned on the news that she had been terminated.

104. That the city failed to give Ms. Richardson a thirty (30) day notice stating any deficiencies and the need to correct the same as required by the contract.

105. In addition to serving as the CEO of the HPHA, Ms. Richardson also served as the CEO

of Nu-Dimensions, Inc.("Nu-Dimensions").

106. Nu-Dimensions, a non-profit corporation, worked in conjunction with the HPHA, housing the offices of the HPHA and owning the affordable housing units under RAD.

107. Nu-Dimensions and the HPHA entered into a five (5) year agreement on June 1, 2023 (Ex. "F").

108. The agreement mandated that if the HPHA terminated the employment of the CEO, for cause or any other reason, Nu-Dimensions would advise and consent on the termination.

109. The agreement also mandated that, "in the event of termination of the HHA Executive Director, Nu-Dimensions must approve the replacement hired to fill that position, so long as the Management Agreement…is in effect."

110. That Nu-Dimensions advice and consent was not sought prior to Ms. Richardson's termination.

111. That Nu-Dimensions did not approve of the replacement hired to fill the position.

112. That Nu-Dimensions was never consulted regarding the termination.

113. Upon information and belief, the HPHA and Nu-Dimensions, with Ms. Richardson at the helm, has been perceived as an impediment to the city's development of valuable, non-affordable housing.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of 42 U.S.C. § 1981)

114. The allegations contained in paragraphs 1-113 are re-alleged and incorporated herein by reference.

115. Ms. Richardson's contract with the HPHA expired on June 1, 2028.

116. That the city abolished the HPHA in January 2025.

117. That the city implemented a "change in control" of the HPHA as set out in Ms. Richardson's contract and addendum thereto.

118. Ms. Richardson was terminated on or around January 16, 2025.

119. That the city failed to give Ms. Richardson a thirty (30) day notice of any deficiencies that needed to be addressed in her performance and the need to correct the same, as required by the contract.

120. The city failed to give Ms. Richardson notice of the termination as required by her contract and addendum thereto.

121. The city implemented a "change of control" when it decided to cede the HPHA to the WPCOG.

122. The city has failed to pay Ms. Richardson all amounts due under the contract in the event there was a "change in control" of the HPHA.

123. That the failure to pay Ms. Richardson is relegated to race-based decisions by the city and the same falls under the governance of 42 U.S.C. § 1981.

124. The failure to pay Ms. Richardson all amounts due under her contract is a direct and proximate result of the city's failed attempt to wrongfully accuse only the African-Americans on the board of "neglect of duty" and/or "misconduct in office" subsequent to a duly noticed board meeting and vote on the Addendum to her contract.

125. That the tenor and content of the letter is replete with alleged examples of alleged ineffectiveness and inefficiency, none of which are actually attributable to the performance of the board nor Ms. Richardson, the same being only a pretext.

126. That at no time prior to the letters being sent to only the African American board members did the mayor or city council express any dissatisfaction with them or of their

performance.

127. That the discrimination described hereinabove is the "but-for" cause of the defendant's failure to honor its contractual relationship with Ms. Richardson.

128. That the discrimination described hereinabove is intentional.

129. That a legally binding and enforceable contract exists between the city and Ms. Richardson and no legitimate cause exist for the city's failure to honor the same.

130. As a direct, proximate and foreseeable result of having been the victim of the discriminatory conduct that the Defendant has directed toward Plaintiff, she has been damaged. She will continue to lose substantial wages and benefits, with a resulting loss of future earnings and enjoyment of life due to the unlawful failure and refusal of the city to honor its contractual agreement. She has also suffered, and is continuing to suffer, severe emotional distress, depression, and mental anguish.

131. As compensation for the above-noted injuries and losses, Plaintiff is entitled to recover compensatory damages from Defendant in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00) in addition to sums due under the contact.

## COUNT II
### (Breach of Contract)

132. The allegations contained in paragraphs 1-131 are re-alleged and incorporated herein by reference.

133. That a legally binding and enforceable contract exists between the city and Ms. Richardson.

134. That Ms. Richardson satisfactorily performed under the contract as she has been the

CEO/Executive Director for more than Twenty-Six (26) years.

135. That the city breached the contract and addendum thereto by failing to pay Ms. Richardson all amounts due under the contract in the event of her termination as CEO/Executive Director.

136. As a direct, proximate and foreseeable result of the city's breach of contract, the Plaintiff has been damaged. She will continue to lose substantial wages and benefits, with a resulting loss of future earnings and enjoyment of life due to the city's breach and its failure and refusal to honor its contractual agreement. She has also suffered, and is continuing to suffer severe emotional distress, depression, and mental anguish.

137. As compensation for the above-noted injuries and losses, Plaintiff is entitled to recover compensatory damages from Defendant in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00) in addition to sums due under the contact.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiff respectfully prays that:

1. As to Count I of this Complaint, Plaintiff have and recover of the Defendant. compensatory damages in an amount in excess of Twenty-Five Thousand and No/100ths Dollars ($25,000.00) in addition to all amounts due under the contract and the addendum thereto.

2. As to Count II of this Complaint, Plaintiff have and recover of the Defendant. compensatory damages in an amount in excess of Twenty-Five Thousand and No/100ths Dollars ($25,000.00) in addition to all amounts due under the contract and the addendum thereto.

3. As to all appropriate Counts of this Complaint, Plaintiff have and recover reasonable attorneys' fees from the Defendants.

4. As to all appropriate Counts of this Complaint, Plaintiff be awarded pre-judgment and post-judgment interest.

5. That the costs of this action be taxed against the Defendants.

6. That this case have a **Trial by Jury** on all issues so triable.

7. For such other and further relief as to the Court may seem just and proper.

This the 18th day of September, 2025.

                                          **HAIRSTON LANE, P.A.**

                                          ***/s/ James E. Hairston, Jr.***
James E. Hairston, Jr.
NC Bar No.: 19687
434 Fayetteville Street
Suite 2350
Raleigh, North Carolina 27602
(919) 838-5295 Telephone
(888) 510-1160 Facsimile
E-mail: jhairston@hairstonlane.com